FILED
CLERK, U.S. DISTRICT COURT

11/14/23

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ EB _____ DEPUTY

FEE PAID

Cameron N Verdi
220 Newport Center Drive #11-122
Newport Beach, Ca 92660
Telephone (949) 887 - 0492
Facsimile: (949) 625 -7850
cameronverdi@gmail.com

Appearing in *Propria persona*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAMERON N. VERDI, an individual, | Case No. 8:23-cv-02131-DOC-KESx |
| Plaintiff, | **COMPLAINT FOR:** |
| vs. | 1. FRAUDULENT CONCEALMENT<br>2. CONSTRUCTIVE FRAUD<br>3. CONSPIRACY TO DEFRAUD |
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR SIGNATURE BANK, a New York corporation; JOSEPH DEPAOLO, an individual; STEPHEN WYREMSKI, an individual; ERIC HOWELL, an individual; and DOES 1 through 10, inclusive, | 4. BREACH OF FIDUCIARY DUTY<br>5. BREACH OF DUTY OF LOYALTY<br>6. AIDING AND ABETTING BREACH OF FIDUCIARY DUTY |
| Defendants. | Demand for Jury Trial |

## I.    <u>INTRODUCTION</u>

1)    Plaintiff Cameron N. Verdi (hereinafter "Plaintiff"), hereby files this complaint against Defendants (defined below) alleging the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by Plaintiff, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Signature

Bank (hereinafter "Signature Bank" or the "Company"), and information readily obtainable on the Internet. [1] Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

2)      Plaintiff is a shareholder of the Company, who purchased the publicly traded Company's securities between March 1, 2022 and March 10, 2023 (hereinafter "SBNY stock").

3.      Plaintiff seeks to recover compensable damages caused by Defendants.

**II.     <u>JURISDICTION AND VENUE</u>**

4.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331.

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1391(c)(2). The amount in controversy exceeds the jurisdictional minimum of this Court. At all times alleged herein, one or more Defendants were residents of, or were doing business in, the State of California, County of Orange.

6.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**III.    <u>JURY TRIAL DEMAND</u>**

7.      Plaintiff requests a trial by jury of all claims and issues so triable.

**IV.    <u>THE PARTIES</u>**

**A.     <u>PLAINTIFF</u>**

8)      Plaintiff, CAMERON N VERDI is a natural person who, at all times alleged herein, was a resident of the County of Orange, California.

---

[1] On March 12, 2023, the Federal Deposit Insurance Corporation ("FDIC-R") was appointed as the Receiver for Signature Bank.

## B.    ENTITY DEFENDANT

9)    Defendant Signature Bank was incorporated in New York and its head office was located at 565 Fifth Avenue, New York, N.Y. Signature Bank common stock trades on the NASDAQ Exchange (hereinafter "NASDAQ") under the ticker symbol "SBNY".

10)    The Company purported to be a "New York-based full-service commercial bank with 40 private client offices located throughout the metropolitan New York area, as well as those in Connecticut, **California**, Nevada and North Carolina." (emphasis added)

11)    The Company, as purported on July 8, 2020, by Joseph J. DePaolo, President and Chief Executive Officer of the Company;

"While our roots date back 20 years to our New York City inception as an entrepreneurial start-up commercial bank, Signature Bank has quickly grown from our initial beginnings in Manhattan and Brooklyn. First, we expanded into the greater metropolitan-New York area, and then, 16 years later, **we established operations on the West Coast in 2017.** With our proven single-point-of-contact banking model at our core, we realized the vast opportunity for bankers and clients alike on the **West Coast.**" (emphasis added)

12)    On July 8, 2020, the Company purported:

"Judi Prejean, who will oversee the Bank's West Coast growth and ongoing operations, was appointed to the post of Executive Director, West Coast Banking Operations, along with 45 professionals, spanning 15private client banking teams. Total teams comprising Signature Bank's West Coast Banking Operations are now at 19, which consists of 61 banking professionals.

The new teams will be based in both Northern and Southern California, and as a result, Signature Bank will open four new private client banking offices in the Southern California areas of Warner Center (Woodland Hills), Newport Beach, Beverly Hills and Ontario. Concurrently, the Bank will enhance its presence in San Francisco with the appointment of five additional teams to its flagship Mission Street office."

13)    The Company has relationship with California and has performed acts which implicate California law or the California long-arm statute. The Company is registered to do business in the State of California; conducts and transacts business in the State of California; owns, leases, or manages real property in the State of California; has bank accounts in the State of California; insures persons and entities in the State of California; has employees in the State of California; and pays taxes in the State of

California. The Company has purposefully availed itself of the privilege of conducting business in the State of California.

### C.   <u>INDIVIDUAL DEFENDANTS</u>

14) Defendant Joseph DePaolo (hereinafter "DePaolo") served as the Company's Chief Executive Officer from 2001 until March 12, 2023. DePaolo maintained continuous contact with California through his ownership and management (including within the borders of California) of the Company.

15) Defendant Stephen Wyremski (hereinafter "Wyremski") served as the Company's Chief Financial Officer and Senior Vice President from June 2021 until March 12, 2023. Wyremski maintained continuous contact with California through his ownership and management (including within the borders of California) of the Company.

16) Defendant Eric Howell (hereinafter "Howell") served as the Company's President and Chief Operating Officer from June 2021 until March 12, 2023. Howell maintained continuous contact with California through his ownership and management (including within the borders of California) of the Company.

17) Defendants DePaolo, Wyremski, and Howell are collectively referred to herein as the "Individual Defendants."

18) Each of the Individual Defendants:

(a)    directly participated in the management of the Company, including its contacts with California;

(b)    was directly involved in the day-to-day operations of the Company at the highest levels, including performing these services within California;

(c)    was privy to confidential proprietary information concerning the Company and its business and operations;

(d)    was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls, including the Company's California operations and activities;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of their fiduciary duties, which supports the inference that these Defendants could have reasonably anticipated being summoned to a court in California.

### D.   DOES

19)     The true names and capacities of those Defendants sued herein as Does 1 through 10, inclusive, are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names. Plaintiff will amend the complaint to show the true names and capacities of those Defendants when the same have been ascertained. Whenever reference is made to any named party to this action including, but not limited to, references to "Defendants," "Company," "Individual Defendants," or other like terms, it shall include said "Does."

20)     The Company, Individual Defendants, Does are collectively referred to herein as "Defendants."

### V.   FACTUAL BACKGROUND

21)     Plaintiff has been an active equity, securities, and the related investor since 2001.

22)     Plaintiff does not hold any formal education or securities license for investing and trading equities, securities, and the related.

23)     Plaintiff only invests his own money.

24)     Plaintiff has never held a deposit account (savings or checking) with the Company.

25)     On March 1, 2022, Plaintiff purchased shares of the Company on the NASDAQ (the "March 2022 Shares Purchase").

26)   In December 2022, Signature Bank announced that it planned to significantly lower its exposure to the crypto industry. The Company had already lost billions of dollars of crypto-related deposits, the Company's executives had said.

27)   In February 2023, the Company announced that DePaolo would be stepping down as the bank's president and chief executive officer. Howell was named as his successor.

28)   On March 2, 2023, the Company issued a press release linking to a presentation that gave a Mid-Quarter Financial Update (the "March 2 Update"). The March 2 Update was uploaded to the Company's website. In pertinent part, this presentation stated that "[t]he average balance quarter-to-date is $88.79 billion, which is higher than the December 31, 2022 balance of $88.59 billion, and lower than the fourth quarter 2022 quarter-to-date average balance of $98.6 billion."

29)   Furthermore, the presentation stated that "[d]eposits have increased $682 million thus far this quarter, excluding digital asset client related balances" and "[t]he decrease in deposit balances this quarter has been driven by the deliberate decline in digital asset client related deposits of $1.51 billion, as the Bank continues to reduce the size of deposit relationships in this space."

30)   The March 2 Update stated, "The mid-quarter financial update can be found in the investor relations section of the Bank's web site." However, as of April 8, 2023, the March 2 Update was no longer available on "the Bank's website."

31)   Then, on March 9, 2023, the Company issued a Press Release entitled "Signature Bank Issues Updated Financial Figures as of March 8, 2023; Reiterates Strong Financial Position and Limited Digital-Asset Related Deposit Balances in Wake of Industry Developments" (the "March 9 Update"). The March 9 Update was tailored to calm investors and depositors in the wake of chaos in the banking sector, such as the collapse of Silicon Valley Bank.

32)   The March 9 Update overstated the Company's market position, given that just a three (3) days later, it was shut down by the New York Department of

Financial Services ("DFS"). In pertinent part, the March 9 Update stated that Signature Bank had the following attributes:

- "A proven, stable commercial banking business model within excess of $100 billion in well-diversified assets across nine national business lines and nearly 130 commercial banking teams spanning its metropolitan New York area and West Coast footprint;"

- "A diversified deposit mix, with more than 80 percent of deposits coming from middle market businesses, such as law firms, accounting practices, healthcare companies, manufacturing companies and real estate management firms;"

- "A high level of capital as evidenced by a common equity tier 1 risk-based capital ratio of 10.42 percent, which is well in excess of regulatory requirements, as of year-end 2022;"

- "[Signature Bank] announced today updated financial figures as of March 8, 2023 and reiterated its strong, well-diversified financial position and limited digital-asset related deposit balances in the wake of industry developments."

33)     DePaolo was also quoted in the March 9 Update. In pertinent part, he stated:

"We want to make it clear again that Signature Bank is a well-diversified, full-service commercial bank with more than two decades of history and solid performance serving middle market businesses. *We have built a strong reputation serving commercial clients through nine business lines and reached in excess of $100 billion in assets by continually executing our single-point-of-contact, relationship-based model where banking teams are capable of meeting all client needs,*" (emphasis added)

"As a reminder, Signature Bank does not invest in, does not trade, does not hold, does not custody and does not lend against or make loans collateralized by digital assets,"

34)     Howell was also quoted in the March 9 Update. In pertinent part, he stated:

"We have repeatedly communicated that our relationships in the digital asset space are limited to U.S. dollar deposits only, and we remain fully committed to executing on our plan to deliberately reduce these deposits further. Since we opened our doors, we have been a 'deposit-first' institution and have always been committed to our depositors' safety, first and foremost. *As shown by our current metrics, we intentionally maintain a high level of capital, strong liquidity profile and solid earnings, which continues to differentiate us from competitors, especially during challenging times,*" (emphasis added).

35) On March 10, 2023, after reading and ultimately relying on the March 2 Update and March 9 Update, Plaintiff purchased additional shares of the Company on the NASDAQ (the "March 2023 Shares Purchase").

36) To finance the March 2023 Shares Purchase, Plaintiff borrowed monies through a credit facility offered by the online stock trading, investing, brokerage, TD Ameritrade.

37) The credit facility offered by TD Ameritrade gave Plaintiff the ability to buy SBNY stock on "margin."

38) TD Ameritrade, like many online brokerages, offer investors the ability to buy margin based on a risk calculation of the account holder's [Plaintiff] assets. There are several contributing factors to the calculation, including long-term and short-term security holdings, and cash available for trading etc.

39) The margin interest rate offered by TD Ameritrade to Plaintiff, at the time of the March 2023 Shares Purchase, ranged between 7.60% - 10.85% (annualized).

40) The statements contained in ¶¶ 28 - 34 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Signature Bank did not have the strong fundamentals that it represented itself as having in the days immediately prior to its takeover, or otherwise took action that left it susceptible to a takeover by the New York Department of Financial Services ("DFS"); (2) as a result, it became a target for regulatory action by the DFS, (3) FDIC examiners had raised serious concerns in written and verbal communications, including less than satisfactory ratings for liquidity management, to Signature's management team at least five years before it experienced a liquidity crisis. Candid discussions with its Board about deficiencies in liquidity, deposit volatility, and corporate governance occurred as

recently as February 15, 2023, and (4) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

## VI.   REGULATORS AND THEIR AGENCIES INTERVENE

41)   On Sunday March 12, 2023, the DFS announced that, in order to protect depositors and pursuant to Section 606 of New York Banking Law, DFS had taken possession of Signature Bank. DFS further stated that it was "in close contact with all regulated entities in light of market events, monitoring market trends, and collaborating closely with other state and federal regulators to protect consumers, ensure the health of the entities we regulate, and preserve the stability of the global financial system."

42)   Section 606 of New York Banking Law states, in pertinent part, "[t]he Superintendent may, in his discretion, forthwith take possession of the business and property of any banking organization whenever it shall appear that such banking organization:

(a)   has violated any law;
(b)   is conducting its business in an unauthorized or unsafe manner;
*(c)   is in an unsound or unsafe condition to transact its business;*
*(d)   Cannot with safety and expediency continue business;*
*(e)   Has an impairment of its capital; or, in the case of a mutual savings and loan association or credit union, has assets insufficient to pay its debts and the amount due members upon their shares;*
(f)   Has suspended payment of its obligations; or, in the case of a mutual savings and loan association, has failed for sixty days after a withdrawal application has been filed with it by any shareholder to pay such withdrawal application in full;
(g)   Has neglected or refused to comply with the terms of a duly issued order of the superintendent;
(h)   Has refused, upon proper demand, to submit its records and affairs for inspection to an examiner of the department;
(i)   Has refused to be examined upon oath regarding its affairs; (j) Has neglected, refused or failed to take or continue proceedings for voluntary liquidation in accordance with any of the provisions of this chapter." (emphasis added).

43)   New York banking laws (similar to California) allow regulators to take over banks that meet a set of conditions, including the inability to safely continue doing business, being in an "unsound or unsafe condition," and having insufficient assets to pay its debts or amounts due to shareholders.

44)   As a result of the specific circumstances in which the DFS Superintendent may, in his or her discretion, take possession of a bank, the March 2 and March 9

Updates did not provide Plaintiff with a fully transparent, credible or candid assessment of the material risks currently facing Signature Bank, or hint that being taken over by DFS was a viable concern.

45)    In a Joint Statement on March 12, 2023 (the "Joint Statement"), Federal Reserve Chair Jerome Powell (hereinafter "Powell"), Treasury Secretary Janet Yellen (hereinafter "Yellen"), and Federal Deposit Insurance Corporation (hereinafter "FDIC") Chair Martin Gruenberg (hereinafter "Gruenberg"), followed up on DFS's announcement. In pertinent part, the Joint Statement provided the following:

"[In addition to providing a systemic risk exception for SBV Financial Group], [w]e are also announcing a similar systemic risk exception for Signature Bank, New York, New York, which was closed today by its state chartering authority. All depositors of this institution will be made whole. As with the resolution of Silicon Valley Bank, no losses will be borne by the taxpayer. ***Shareholders and certain unsecured debtholders will not be protected. Senior management has also been removed. Any losses to the Deposit Insurance Fund to support uninsured depositors will be recovered by a special assessment on banks, as required by law.***" (emphasis added).

46)    On March 12, 2023, trading in the Company's shares on the NASDAQ were halted and remained halted until March 28, 2023, essentially rendering SBNY stock illiquid and valueless - given the bank's failure.

## VII.   **GENERAL ALLEGATIONS**

47)    Plaintiff incorporates the foregoing allegations ¶¶ 1 – 46  as if fully set forth herein.

## **Based on information and belief, and thereon alleged:**

48)    Defendants employed devices, schemes and artifices to defraud the investing public, residents of California, including Plaintiff, which supports the inference that these Defendants could have reasonably anticipated being summoned to a court in California.

49)    Defendants made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

50)     Defendants engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff in connection with his purchases of SBNY stock during March 2022 through March 10, 2023.

51)     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public, to include residents of California; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

52)     Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company's personnel to members of the investing public, residents of California, including Plaintiff.

53)     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

54)     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

55)     As a result of the foregoing, the market price of the Company's securities was artificially inflated during Plaintiff's March 2022 Shares Purchase and March 2023 Shares Purchase period. In ignorance of the falsity of Defendants' statements, Plaintiff relied on the statements (not limited to the March 2 and 9 Updates) described above in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

56)     Had Plaintiff been aware that the market price of the Company's securities had been artificially inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, he would not have purchased the Company's securities at the artificially inflated prices that he did, or at all.

57)     During the Plaintiff's March 2022 Shares Purchase and March 2023 Shares Purchase period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's misstatement of revenue and profit and false financial statements.

58)     As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

59)     Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Plaintiff's March 2022 Shares Purchase and March 2023 Shares Purchase period concerning the Company's results of operations. Throughout the Plaintiff's March 2022 Shares Purchase and March 2023 Shares Purchase period, the Individual Defendants exercised their power and authority (i.e., meeting of the minds) to cause the Company to engage in the wrongful acts complained

of herein. Such conduct supports the inference that these Defendants could have reasonably anticipated being summoned to a court in California.

60)     At the Company, the executives responsible for overseeing the bank's risk were also champions of its courting of the crypto industry. That strategy focused on an internal payments platform called Signet that was used by crypto companies to manage their cash. The Company did not hold or lend cryptocurrency itself.

61)     DePaolo and Howell were part of the executive team overseeing the risks connected to the crypto industry. Also, both DePaolo and Howell joined the board and risk committee in April 2022.

62)     DePaolo sold $13.9 million of shares in 2021. And Howell sold $14.9 million of shares that same year.

63)     DePaolo and Howell sold collectively another $9.2 million shares in March 2022.

64)     Signature Bank was one of only two companies in the S&P 500 that did not file insider-trading transactions to the SEC.

65)     Filings with the FDIC typically escape notice from investors and services that track insider trades.

66)     Signature Bank also miscategorized some of its FDIC filings as dispositions to the company, meaning the shares were sold to the company, rather than sales on the open market.

67)     With the Individual Defendants' appointment as officers, they assumed, both expressly and impliedly, a duty of loyalty, a duty of care, a duty of good faith and fair dealing and a fiduciary duty to the Company and its shareholders, to include Plaintiff.

68)     The Individual Defendants, in particular, maintained a fiduciary duty to disclose all facts that would reasonably require disclosure by a fiduciary or someone in Individual Defendants' position.

**COMPLAINT; DEMAND FOR JURY TRIAL**

69)     The Individual Defendants received compensation from the Company in exchange for the services connected, but not limited to, these fiduciary duties.

70)     A component of the Individual Defendants' compensation package, awards of SBNY stock.

71)     The awards (i.e., SBNY stock) received by the Individual Defendants from the Company, as part of their compensation, were traded on the NASDAQ under the ticker symbol SBNY.

72)     The Individual Defendants personal wealth was partially connected to the value of the SBNY stock gaining or losing value.

73)     As a result, the Defendants had personal financial motivation to inflate the value of the SBNY stock.

74)     Signature Bank's crypto bet soured in 2022 as some cryptocurrencies imploded and the price of bitcoin crashed. The Company's shares were dragged down with it, falling 64% on the year, while the bank's deposits shrank by 17%. Signature Bank's price drop far outpaced the 15% decline in the SPDR S&P Regional Banking ETF over the same period. Signature Bank's risk committee met four times in 2022, according to a company filing to the FDIC.

75)     The Individual Defendants, in their individual capacity and as an agent and representative of the Company made misrepresentations as to material matters to the public, residents of California, including Plaintiff, regarding the welfare of the Company.

76)     Given the laws the Company was subject to, the Signature Bank's reports didn't give investors full view of the risks it was facing, or hint that it might be on the road to seizure.

77)     Plaintiff relied on these misrepresentations and omissions, to include, but not limited to, the March 2 Update and March 9 Update.

78)     The Individual Defendants began discussions internally (i.e., meeting of the minds), commencing as early as January 2018 until March 12, 2023, over

telephonic and electronic transmissions, their concerns over the risks inherited by the instability of the cryptocurrency market, rising interest rates, amount of bond holdings, and amount of uninsured deposits.

79)   About 90% of the Company's deposits were not insured by the FDIC.

80)   More specifically, the Individual Defendants began discussions internally regarding the Company's risks controls.

81)   Key issues for the Company were inflation, which had jumped above 5% after decades around 2%, and the disproportionate amount of deposit accounts that exceeded the FDIC insurable limits.

82)   The Individual Defendants also began discussions internally regarding the unrealized losses stemming from the increase in bond prices, and crash in crypto currencies.

83)   The FDIC had warned the Company of rising rates adversely impacting bond prices, which some banks, including the Company, had favored for additional yield.

84)   The value of the Company's bond holdings reduced its capital, the cushion between assets and liabilities that absorbs losses.

85)   The Company received alerts from the FDIC instructing of "matter[s] requiring attention."

86)   In November 2022, data included in the FDIC twice-yearly financial stability report showed uninsured deposits had steadily risen as a share of financial system funding with the potential to leave quickly.

87)   Defendants gave inadequate attention to this risk and failed to disclose the concern properly and adequately to the public, residents of California, including Plaintiff.

88)   The Company lacked significant bond exposure but maintained significant dependence on uninsured deposits.

89)     On February 15, 2023, regulators from the FDIC and DFS met with Signature Bank's board of directors.

90)     As reported by the Wall Street Journal on March 24, 2023, The FDIC said its *"examiners raised serious concerns in written and verbal communications, including less than satisfactory ratings for liquidity management, to Signature's management team at least five years before it experienced a liquidity crisis. Candid discussions with its Board about deficiencies in liquidity, deposit volatility, and corporate governance occurred as recently as February 15."*

91)     Defendants actively concealed the FDIC's examiners discussions addressing concerns with the board from their March 2 Update and March 9 Update.

92)     Said differently, Defendants actively concealed concerns raised by the FDIC by issuing their March 2 Update and March 9 Update to artificially excite the public, and SBNY shareholders, including residents of California and Plaintiff.

93)     Defendants routinely met and/or received correspondences from regulatory bodies addressing concerns over threshold risks, macroeconomic concerns, and stress test results.

94)     These correspondences should have alerted Defendants that Signature Bank was, in fact, at risk of regulatory intervention.

95)     While Defendants knew of these candid risks, Plaintiff did not. And given the nature of how Signature Bank reported material facts to the FDIC, instead of the SEC, the facts were difficult to discover.

96)     As a result, Defendants knew much more about the instability of Signature Bank, including information unavailable to the public.

97)      The Defendants actively assisted one another in the promotion of the Company's stability, both to internal staff, auditors, regulators, and the public.

98)     The Defendants actively assisted one another to cloud the techniques designed to measure risk.

**COMPLAINT; DEMAND FOR JURY TRIAL**

99)   The Defendants misrepresented material facts about the business and financial condition of the Company to the investing public, residents of California, including Plaintiff.

100)   The Defendants omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, misleading the Plaintiff.

101)   The Defendants caused the Company to issue false and misleading filings to the investing public, residents of California, including Plaintiff.

102)   Individual Defendants' failure of adequate asset liability management, their failure to disclose their ineptness management of risk, while simultaneously selling SBNY stock from their personal holdings, fueled their need to artificially inflate the public's, including Plaintiff's, view of the welfare of the Company.

103)   The Defendants acted knowingly or recklessly in issuing false filings and statements.

104)   Prices paid by Plaintiff for the March 2022 Shares Purchase and March 2023 Shares Purchase were artificially inflated due to Defendants' conduct complained herein.

105)   The Defendants personal wealth benefitted from the Company having an artificially inflated stock price.

106)   Plaintiff relied on all publicly available material presented and offered by the Defendants, to include but not limited to, the March 2 Update and March 9 Update.

107)   Because the Company's securities were actively traded on the NASDAQ, the Company was required to file public reports.

108)   Plaintiff's March 2022 Shares Purchase and March 2023 Shares Purchase were both of SBNY stock.

109)   The Defendants actively communicated with public investors, including residents of California and Plaintiff, via established market communication mechanisms, including through regular dissemination of press releases via major

newswire services and through their required public disclosures (hereinafter "Defendants' communications").

110)   The Defendants understood the Defendants' communications would be reviewed by the public, and shareholders, as similarly situated to California residents and the Plaintiff.

111)   During Plaintiff's March 2022 Shares Purchase and March 2023 Shares Purchase period, the Company's securities were liquid and traded with moderate to heavy volume.

112)   Plaintiff, as a shareholder, regularly reviewed and relied on the Defendants' communications.

113)   Had the omitted material facts been disclosed, Plaintiff would have been aware of the Company's instability and behaved differently.

114)   The Defendants had internal discussions regarding what material facts to omit from the March 2 Update and March 9 Update.

115)   Both the March 2 Update and March 9 Update had multiple drafts that had been reviewed and edited by the Defendants and Company staff.

116)   Defendants had knowledge of the increased scrutiny and concern expressed from regulators to the Company, to include but not limited to the FDIC and DFS.

117)   Defendants omitted these material facts from the March 2 Update and March 9 Update.

118)   Defendants had internal discussions with financial auditors regarding the instability of the Company.

119)   Defendants were complicit in the misrepresentations and omissions, i.e., aider and abettors to one another.

120)   Defendants were actively engaged in efforts to promote the Company as a stable and viable asset, with full knowledge that it was not.

**COMPLAINT; DEMAND FOR JURY TRIAL**

121)  Defendants were responsible in some manner for the practices, acts, conduct, and occurrences alleged herein, as either actual perpetrators or co-conspirators, aiders and abettors, officers, directors, and/or managing agents with the knowledge, control, authority, direction, and/or ratification of the other Defendants, and each of them.

122)  At all relevant times, as alleged more fully herein, each Defendant acted as an agent, servant, employee, co-conspirator, alter-ego and/or joint venturer of the other Defendants, and in doing the things alleged herein acted within the course and scope of such agency, employment, alter-ego and/or in furtherance of the joint venture. Each of the Defendant's acts alleged herein was done with the permission and consent of each of the other Defendants.

123)  As members of the conspiracies, as alleged herein, each of the Defendants participated and acted with or in furtherance of said conspiracy or aided or assisted in carrying out the purposes of the conspiracy and have performed acts and made statements in furtherance of the conspiracy and other violations of California law.

124)  Defendants provided assistance to Individual Defendants that was a substantial factor in causing the harm suffered.

125)  Defendants understood Individual Defendants held a fiduciary duty with shareholders, including Plaintiff.

126)  Defendants understood Individual Defendants' misrepresentations and omissions of material facts to Plaintiff was a breach of their fiduciary duties.

127)  Each Defendant acted both individually and in alignment with the other Defendants with full knowledge of their respective wrongful conduct. As such, Defendants conspired together, building upon each other's wrongdoing, in order to accomplish the acts outlined in this Complaint.

128)  Defendants are individually sued as principals, participants, aiders and abettors, and co-conspirators in the wrongful conduct complained of and the liability

of each arises from the fact that each has engaged in all or part of the improper acts, plans, schemes, conspiracies, or transactions complained of herein.

129) Defendants' conspiratorial conduct included improper efforts to misinform and omit material facts from Plaintiff, resulted in him proceeding with his March 2022 Shares Purchase and March 2023 Shares Purchase and incur additional costs associated with buying on margin.

130) Individual Defendants' acts, omissions and concealment involving their breach of fiduciary duties, trust, and confidence, resulted in damages to Plaintiff.

131) The Company's shares were temporarily halted from trading on the NASDAQ on or about March 10, 2023.

132) As of March 10, 2023, the Company's share price (ticker symbol SBNY) was $70.00 USD/share.

133) On or about March 28, 2023, the Company's shares resumed trading on the NASDAQ.

134) As of March 28, 2023, the Company's share price (ticker symbol SBNY) was now $0.14 USD/share (as of April 11, 2023).

135) During March 10, 2023 through March 28, 2023, Plaintiff, along with the general public, were unable to divest of their SBNY stock.

136) The Plaintiff continues to bear margin interest charges from the March 2023 Shares Purchase.

137) As a result of Defendants' conduct, that triggered the suspension of SBNY's stock on the NASDAQ, Plaintiff had to sell other securities at a financial loss to reduce his margin balance.

138) At the time of the filing of this Complaint, Plaintiff remains a shareholder of the Company.

139) Defendants' conduct caused substantial harm to Plaintiff, to include his inability to timely liquidate the SBNY stock, accrual of margin interest rate fees in connection with the March 2023 Shares Purchase, and the liquidation of other equities

at a loss to reduce margin balances and avoid margin calls and/or Reg.T margin calls, incurring significant, and consequential damages.

140)   As a result of Defendants' wrongful acts and omissions, resulting in the precipitous decline in the market value of the Company's common shares, Plaintiff has suffered significant losses and damages.

## **FIRST CAUSE OF ACTION**

### FRAUDULENT CONCEALMENT

### (As to all Defendants)

141)   Plaintiff refers to and realleges paragraphs 1 through 140, inclusive, as if set forth at length herein.

142)   Individual Defendants maintained a fiduciary relationship with Plaintiff.

143) Defendants maintained a duty to disclose the omitted facts. Defendants had exclusive knowledge of material facts not known to the Plaintiff. More specifically, and not intended to be all exhaustive, as Plaintiff continues to investigate and compile the list of the representations ultimately discovered to be false or material facts omitted:

a)      FDIC examiners had raised serious concerns in written and verbal communications, including less than satisfactory ratings for liquidity management, to Signature Bank's management team at least five years before it experienced a liquidity crisis. Candid discussions with its Board about deficiencies in liquidity, deposit volatility, and corporate governance occurred as recently as February 15, 2023,

b)      Signature Bank did not have the strong fundamentals that it represented itself as having in the days immediately prior to its takeover,

c)      Defendants failed to take adequate action that left it vulnerable to a takeover by the New York Department of Financial Services ("DFS"),

d)      Signature Bank was a target for regulatory action by the DFS,

1    e)    Signature Bank was not a "proven, stable commercial banking business

2  model",

3    f)    Signature Bank did not have in excess of $100 billion in "well-

4  diversified assets",

5    g)    Signature Bank did not have "a diversified deposit mix",

6    h)    Signature Bank did not have a "strong, well-diversified financial

7  position",

8    i)    Signature Bank was not "capable of meeting all client needs",

9    j)    Signature Bank did not "maintain a high level of capital",

10    k)    Signature Bank did not have a "strong liquidity profile".

11    144)   Defendants actively concealed material facts from Plaintiff in their

12  March 2 Update and March 9 Update.

13    145)   Defendants made partial representations but also suppressed some

14  material facts in their March 2 Update and March 9 Update. Defendants knowingly

15  and intentionally withheld information that was solely within their knowledge and

16  which is material, and would have been material, to the decision by Plaintiff to

17  purchase SBNY stock.

18    146)   Defendants had a duty to disclose the materials facts to the Plaintiff. It was

19  reasonable for the Defendants, to foresee that their concerted actions would establish

20  significant connections to the forum state (i.e., California), thereby subjecting all of

21  them to litigation in this jurisdiction.

22    147)  The concealment was intentional with intent to defraud Plaintiff.

23  Defendants made the misrepresentations, and omissions with the intent and purpose of

24  inducing actions by the public, residents of California, to include Plaintiff, inducing the

25  purchase of SBNY stock. By creating buyers for the SBNY stock, the price of the

26  security remained artificially inflated. When making the false representations and said

27  omissions, Defendants knew that members of the investing public, residents of

28  California, including Plaintiff, would rely on the representations to their detriment.

148)   Defendants colluded, conspired, or otherwise acted in concert or with the express consent of each other to do the acts alleged above and therefore liable for these acts.

149)   Plaintiff was unaware of the misrepresentations and omissions and reasonably and justifiably acted in reliance on Defendants' representations to his detriment. Defendants were the sole source of trust of this information, and they provided, at times, false and incomplete information. As a direct result of Defendants' false representations and omissions, Plaintiff purchased SBNY stock in March 2022 and March 2023. Had Plaintiff known the true facts and the actual intentions of Defendants, he would not have acted as he did.

150)   As a direct or proximate result of Plaintiff's reasonable and justifiable reliance on Defendants' misrepresentations and omissions, Plaintiff has suffered damages in excess of the jurisdictional minimum of this court.

151)   In acting as alleged herein, Defendants acted with malice, fraud and oppression. Accordingly, Plaintiff is entitled to recover exemplary damages. Alternatively, Defendants intentionally misrepresented facts, deceived Plaintiff and concealed material facts known to them with the intention of thereby depriving Plaintiff of property and/or legal rights or otherwise causing injury to Plaintiff, such that their acts constituted a fraud as defined by California Civil Code section 3294, thereby justifying an award of exemplary damages.

152)   Furthermore, as demonstrated by Defendants omissions, they exhibited a pattern of deceit. Accordingly, punitive damages are appropriate to defer such wrongful, intentional and fraudulent conduct in the future.

## SECOND CAUSE OF ACTION

CONSTRUCTIVE FRAUD

(As to all Defendants)

153)   Plaintiff refers to and realleges paragraphs 1 through 152, inclusive, as if set forth at length herein.

154)   In the alternative, Plaintiff alleges that he was harmed because Defendants misled him by failing to provide Plaintiff with complete and accurate information.

155)   The Individual Defendants were Plaintiff's fiduciary.

156)   The Individual Defendants act on Plaintiff's behalf for purposes of fiduciary duties, to include a duty of loyalty, a duty of care, a duty of good faith and fair dealing and a fiduciary duty to the Company and its shareholders, to include Plaintiff.

157)   Defendants colluded, conspired, or otherwise acted in concert or with the express consent of each other to do the acts alleged above and are therefore liable for these acts.

158)   Defendants knew, or should have known, that the Company was under significant duress.

159)   Defendants misled Plaintiff by failing to disclose this information and providing Plaintiff with information in the March 2 Update and March 9 Update that was incomplete. It was reasonable for the Defendants to foresee that their concerted actions would establish significant connections to the forum state (i.e., California), thereby subjecting all of them to litigation in this jurisdiction.

160)   Plaintiff was harmed by the loss of his investment in the March 2022 Share Purchase, the March 2023 Share Purchase, the interest accrued under buying on margin, and the liquidation of other equities in late March 2023, at a financial loss, to reduce margin balances and avoid margin calls and/or Reg.T margin calls.

161)   Defendants' conduct was a substantial factor in causing Plaintiff's harm.

162) In acting as alleged herein, Defendants acted with malice, fraud and oppression. Accordingly, Plaintiff is entitled to recover exemplary damages. Alternatively, Defendants intentionally misrepresented facts, deceived Plaintiff and concealed material facts known to them with the intention of thereby depriving Plaintiff of property and/or legal rights or otherwise causing injury to Plaintiff, such that their

acts constituted a fraud as defined by California Civil Code section 3294, thereby justifying an award of exemplary damages.

163) Furthermore, as demonstrated by Defendants omissions, they exhibited a pattern of deceit. Accordingly, punitive damages are appropriate to defer such wrongful, intentional and fraudulent conduct in the future.

### THIRD CAUSE OF ACTION

CONSPIRACY TO DEFRAUD

(As to all Defendants)

164) Plaintiff refers to and realleges paragraphs 1 through 163, inclusive, as if set forth at length herein.

165) Defendants aided and conspired with one another, to artificially inflate SBNY's stock price and fabricate confidence in the Company's financial viability.

166) Defendants misrepresented and omitted material facts to Plaintiff.

167) Defendants had knowledge of their duty to disclose the misrepresented and omitted material facts.

168) Defendants intended the general investing public, residents of California, including Plaintiff, would rely on their misrepresentations and omitted material facts to be true.

169) Defendants understood omitting certain material facts would be advantageous for the value of SBNY stock.

170) Defendants had knowledge the omissions of material facts, facts raised by FDIC examiners as late as February 2023, would aid in preserving artificial value in SBNY's stock.

171) Defendants had knowledge the omissions of material facts in the March 2 Update, would aid in preserving artificial value in SBNY's stock.

172) Defendants had knowledge the omissions of material facts in the March 9 Update, would aid in preserving artificial value in SBNY's stock.

173)   Defendants were aware the likelihood of intervention by regulators and their agencies was significantly high before their March 2 Update and March 9 Update.

174)   Defendants had internal discussions (i.e., meeting of the minds) about the increased likelihood of intervention by regulators and their agencies before releasing the March 2 Update and March 9 Update.

175)   Defendants agreed and intended that the misrepresented and omitted material facts be committed and received compensation under their employment contracts in furtherance of the fraud upon Plaintiff.

176)   Defendants intended the general investing public, residents of California, including Plaintiff, would rely on their misrepresentations and omitted material facts to be true.

177)   Defendants coordinated, through discussions, meetings, phone conversations, and electronic communications between one another, the contents of public filings and representations, to include press releases and the like. It was reasonable for the Defendants to foresee that their concerted actions would establish significant connections to the forum state (i.e., California), thereby subjecting all of them to litigation in this jurisdiction.

178)   Plaintiff relied on Defendants' representation, to include but not limited to, the March 2 Update and March 9 Update.

179)   Plaintiff would have behaved differently if he had known of the misrepresented and omitted material facts.

180)   Plaintiff was harmed by the loss of his investment in the March 2022 Share Purchase, the March 2023 Share Purchase, the interest accrued under buying on margin, and the liquidation of other equities in late March 2023, at a financial loss, to reduce margin balances and avoid margin calls and/or Reg.T margin calls.

181)   Defendants' conduct was a substantial factor in causing Plaintiff's harm.

182) In acting as alleged herein, Defendants acted with malice, fraud and oppression. Accordingly, Plaintiff is entitled to recover exemplary damages. Alternatively, Defendants intentionally misrepresented facts, deceived Plaintiff and concealed material facts known to them with the intention of thereby depriving Plaintiff of property and/or legal rights or otherwise causing injury to Plaintiff, such that their acts constituted a fraud as defined by California Civil Code section 3294, thereby justifying an award of exemplary damages.

183) Furthermore, as demonstrated by Defendants omissions, they exhibited a pattern of deceit. Accordingly, punitive damages are appropriate to defer such wrongful, intentional and fraudulent conduct in the future.

## **FOURTH CAUSE OF ACTION**

### BREACH OF FIDUCIARY DUTY

(As to all Individual Defendants)

184) Plaintiff refers to and realleges paragraphs 1 through 183, inclusive, as if set forth at length herein.

185) Individual Defendants maintained a fiduciary relationship with Plaintiff as early as March 2022.

186) Individual Defendants owed a duty of loyalty, a duty of care, a duty of good faith and fair dealing and a fiduciary duty to the Company and its shareholders, to include Plaintiff.

187) Individual Defendants acted in a manner that contradicted, or breached, their expected duties, to include but not limited to, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

188) As a result, Plaintiff suffered damages.

COMPLAINT; DEMAND FOR JURY TRIAL

189)   Plaintiff's damages incurred were a direct result of the breach of fiduciary duty.

### FIFTH CAUSE OF ACTION

BREACH OF DUTY OF LOYALTY

(As to all Individual Defendants)

190)   Plaintiff refers to and realleges paragraphs 1 through 189, inclusive, as if set forth at length herein.

191)   In the alternative, Individual Defendants owed a duty of loyalty.

192)   Individual Defendants acted in a manner that contradicted, or breached, their expected duty of loyalty.

193)   As a result, Plaintiff suffered damages.

194)   Plaintiff's damages incurred was a reasonably probable consequence of the act and omission.

### SIXTH CAUSE OF ACTION

AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

(As to all Defendants)

195)   Plaintiff refers to and realleges paragraphs 1 through 194, inclusive, as if set forth at length herein.

196)   Individual Defendants owed fiduciary duties to Plaintiff.

197)   Individual Defendants violated their duty of loyalty to Plaintiff, by, among other things, making misrepresentations and omissions of material facts.

198)   Defendants aided and abetted Individual Defendants' conduct with the misrepresentation and omissions of material facts and conspiracy to defraud Plaintiff for the benefit of themselves.

199)   Defendants had the specific intent to facilitate the wrongful conduct.

200)   Defendants gave substantial assistance to Individual Defendants.

201)   Defendants' conduct was a substantial factor in causing harm to Plaintiff.

COMPLAINT; DEMAND FOR JURY TRIAL

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment against all Defendants, and DOES 1-10 and each of them, as follows:

1.      <u>As to Each Cause of Action</u>: All compensatory damages according to proof;

2.      <u>As to the First, Second, and Third Cause of Action against all Defendants:</u> Punitive Damages pursuant to Civil Code §3294 according to proof;

3.      <u>As to the First, Second, and Third Cause of Action against all Defendants:</u> Exemplary Damages according to proof;

4. For costs of suit incurred herein; and

5. For such other and further relief as the Court may deem just and proper.


DATED:   November 14, 2023



Cameron N Verdi

_/s/ Cameron N Verdi /s/_
Cameron N Verdi

Plaintiff

**COMPLAINT; DEMAND FOR JURY TRIAL**